## QUALIFICATION OF A WITNESS AS AN EXPERT.

### Circuit Court of Cuyahoga County.

HARRY ST. CLAIR HATHAWAY ET AL v. JOHN H. FARLEY ET AL.*

Decided, March 23, 1907.

*Evidence—Witnesses—Expert Testimony—Testimony of a Witness Taken as a Whole May Qualify Him as an Expert—Not Error to Exclude Hypothetical Question which Can Only be Answered One Way —Hypothetical Question Can Not be Asked of Non-Expert Witness.*

1. Although the preliminary examination of a witness may not qualify him as an expert, all of his testimony in chief together with the facts brought out on cross-examination may have that effect.
2. Where a hypothetical question is so framed that it could only be answered in one way and the jury without any assistance from an expert would know that it must be answered in that way its exclusion is not prejudicial error.
3. Hypothetical questions as to a testator's mental condition can not be asked a witness who is not an expert, even upon cross-examination.

---

*Affirmed without report, *Hathaway* v. *Farley*, 76 Ohio State, 562.

*Arnold Green* and *J. P. Dawley*, for plaintiffs in error.
*Higley & Maurer, F. W. Langin* and *T. H. Hogsett*, contra.

MARVIN, J.; WINCH, J., and HENRY, J., concur.

The parties here are as they were in the court below. The suit was brought in the court of common pleas by certain heirs at law of Charles Hathaway, deceased, to have set aside and held for naught a certain paper writing, purporting to be, and duly admitted to probate as, the last will and testament of said deceased. Said writing will hereafter be spoken of in this opinion as the will of the deceased. The ground upon which it was sought to set aside the will was that the testator, at the time of its execution, was wanting in testamentary capacity. The result in the common pleas court was a finding and judgment that this writing was the will of the deceased, and error is prosecuted here to set aside the judgment. The original will was executed on the 8th day of December, 1896, at a time when the testator was about 75 years of age, and codicil to such will was executed on the 4th day of February, 1897. A bill of exceptions is filed here which it is agreed does not contain all the evidence introduced in the case, but which, it is claimed on the part of the plaintiffs, presents errors for which the judgment below should be reversed. These alleged errors occurred chiefly upon the rulings on the admission of evidence.

One of the witnesses examined on the part of the proponents of the will was Dr. A. B. Howard, who testified as appears on page 561 and following of the bill that he was superintendent of the Cleveland State Hospital, and had been such for six years last past; that prior to that he was engaged at a private institution for mental diseases at Cuyahoga Falls for six years; that he became acquainted with the testator in 1895, at a time when a son of the testator was a patient in the institution over which he had charge at Cuyahoga Falls; that this son died in 1897; that during two years he frequently met the testator, and that after the death of the son he met him two or three times within the three months next after such death, and that he saw no evidence of mental unsoundness. On cross-examination Dr. Howard testified that he had charge of the institution at Cuya-

hoga Falls, but he nowhere testified in direct terms that he was a physician, and that he had given special attention to the treatment of mental diseases.  However, he is addressed constantly as Dr. Howard, and among other questions asked him on cross-examination is this:

"Q.  And isn't it true, doctor, that within your experience, long and extensive as it is, that you have known of patients and people who are insane to a marked degree, that were exceedingly acute when it came to the operation of the mind on certain subjects, and that they would display great mental acuteness and alchemy?"

To which the doctor answered: "Yes, sir."

Other questions of this sort were asked of him, so that although the questions asked upon the direct examination did not distinctly bring out that his connection with the two hospitals of which he spoke was that of chief medical officer, yet we think it fair to say that Dr. Howard's testimony was such as to entitle the parties to consider him as a medical expert on the subject of insanity.

On the part of the plaintiffs it is claimed that there was error in the exclusion of answers to the following questions, asked of Dr. Howard by counsel for the defendants:

"Q.  Supposing the ancestors, the mother of an individual to have lived to a healthy old age, to upwards of eighty years of age, strong and vigorous, physically and mentally, up nearly to the last, and that the parent on the other side, the father, was afflicted with insanity, and incarcerated in an insane asylum; that afterwards you find another member of the family, a sister's daughter, afflicted with the same complaint; afterwards you find the son of the individual to whose attention I am calling your mind, afflicted with insanity, and dying in an insane asylum, from which side would you say that the person had inherited that malady; if it were inherited?"

The objection to this question was sustained.
Then followed this question:

"Q.  Does a person born of insane parents more naturally tend to insanity than one born of healthy minded parents?"

An objection to this question was sustained.

As to the first of these questions, it would seem that no error could be possible by the exclusion of an answer to the question. It is assumed in the question that one of the parents of the party under consideration was insane; that a descendant of the same parent was also insane; that the other parent was perfectly sane all of her life, having lived to a good old age, and it is further assumed that the insanity asked about was inherited from somebody, and the question is from which parent was it inherited?

Since it is shown by the question that the party inquired about had inherited insanity, and that but one of his ancestors had any such insanity that could have been inherited, it would seem to follow that but one possible answer could have been given to the question, and that the jury without any assistance from an expert would know that if one parent had a heritable thing and the other parent had no such heritable thing which the party had inherited and which the one parent had and the other had not, he must have inherited it from the one who had it. As to the second of these two questions, several reasons seem to us sufficient to justify the ruling of the court, most of which reasons apply as well to the first of these questions as to the second. We think a sufficient answer as to both the questions is that in neither case did the counsel asking the questions make any statement as to what it was expected the answers would be. If it be said that this was not required because the questions were asked in cross-examination, that seems to be fully answered by the case of *Beam* v. *Green*, 33 Ohio St., 445, where it is said that the proposed question which indicates the matter proposed to be proved was not proper cross-examination. The rule which requires a showing as to what answer is expected in the case of a direct examination is equally applicable to such cross-examination. Neither of the questions now under consideration was a proper cross-examination of any examination which the proponents of the will admitted of Dr. Howard. He was not questioned by them as an expert, but only as any witness might have been examined as to what he had seen in the conduct of Mr. Hathaway.

Another reason why the defendants were not prejudiced by the exclusion of the answer to this last question is shown by a question which had been answered by Dr. Howard immediately preceding the rulings complained of. That question was as follows:

"Q. Doctor, is there such a thing known to the medical profession as hereditary insanity?"

The answer was "Yes, sir."

So that not only was the court justified in excluding the answers to each of these questions, but as to the second one, even if there was error in such exclusion, the defendant had obtained by the question and answer last quoted, all that they could have expected by any answer to the second of which complaint is made.

On page 348 of the record, Mrs. Sarah Hathaway Robison, a daughter of the testator, testified that her grandfather Hathaway had been insane; that one of her brothers had been insane, and that a cousin of her's had been insane; that all of these parties had been patients in hospitals for the insane.

Mr. Frank DeHaas Robison, the husband of the witness last before spoken of, testified that the testator had told him, that his, the testator's father, had been in an insane asylum.

The court said to the jury that this evidence given by Mrs. Robison and by Mr. Robison should be excluded from their consideration.

As to the testimony of Mr. Robison there can be no doubt that the court was right in taking such testimony from the jury as bearing upon the question of the insanity of the testator's father; but we think that the court was wrong in excluding the testimony of Mrs. Robison on this subject. But that wrong was, as we think, righted by what the court said, as appears on pages 755 and 756 of the record. The court here said to the jury, speaking of these rulings, I will leave "such proof as has been offered and which I have once ruled out for your consideration, and give it such weight that you, under the instructions of the court, find it entitled to receive as bearing upon the question of the mental capacity of Charles Hathaway, Sr.,

at the time of the making of the will, and of the making of the codicil, as you will find it entitled to receive in determining that question.''

Bearing in mind that this testimony had been given to the jury and that it was not until some days afterwards that the court had said to the jury that it was to be excluded and then coming to this statement of the court made to the jury, we think that the plaintiffs received all the benefit which they were entitled to receive from the testimony of Mrs. Robison and indeed were permitted to consider what we regard as incompetent testimony given by Mr. Robison.

Complaint is made of the ruling of the court as appears on page 49 of the bill of exceptions, where this question was asked of Mr. Harry St. Clair Hathaway, a grandson of the testator:

''Q. Well, the family of Charles Hathaway, Sr., including yourself, where did they meet, if at all, on holidays such as Thanksgiving days, Christmas days and birthdays of members of the family, including the birthdays of Mr. Hathaway, Sr.?''

The court sustained an objection to this question.

The next question propounded was permitted to be unanswered, and that question and answer are as follows:

''Q. Do you know where, if anywhere, he spent his holidays, that is Charles, Sr., such as Christmas day, Thanksgiving day, and birthdays, that is, after you came here in 1888 or 1889?

''A. Almost every birthday of grandfather, and almost every Christmas during that period, up to his death, I was present with grandfather in the home of Frank DeHaas Robison, first at 648 Superior street, and later at Glenville.''

And later on, speaking of these holiday gatherings this question was asked of this witness:

''Q. And who would be there on these occasions?''

To which he answered:

''A. I would be there, Alfred, George, when he lived here, and all the family, with the exception of Nellie Johnson.''

We do not undertake to say whether there was anything material or not in this question or answer, but surely all that could

have been obtained by an answer to this question was obtained by an answer to the preceding question, so there was no prejudice to the plaintiffs in the ruling complained of.

One Walter D. Sayle, who was not an expert, called by the plaintiffs, had testified that he was acquainted with the testator; that he transacted business with him, and that he regarded him as competent to transact business during the entire time that he observed him, and that from what he saw and knew of him he regarded him as of sound mind. This evidence was perhaps a surprise to the parties calling him, and upon re-examination of this witness this question was asked of him:

"Q. Supposing Charles Hathaway, Sr., in the early part of his life should be married to an estimable wife with whom he lived and raised a family of children in the city of Philadelphia, concerning whom he held the greatest feeling of friendship and affection; that he had purchased a cemetery lot in the city of Philadelphia which is visible upon the photograph which I show you, and then afterwards he entirely forgot that lot, so that at the time you were talking with him he had forgotten that he had that cemetery lot in Philadelphia, would that change your opinion as to his being of sound mind?"

Upon objection made by the proponents of the will to this question, the objection was sustained.

This was followed by a similar hypothetical question to the same witness, and it should be said that evidence had been given tending to show some, perhaps all of the assumed facts in the question; notwithstanding which, we think, the ruling of the court was clearly right.

We are not aware of any ruling which will permit the asking of such hypothetical question to one not an expert, and in the case of *Hayes* v. *Smith*, 62 Ohio St., 161, it is clearly held that such questions can not be asked.

One John Koch was called as a witness on the part of the plaintiffs and testified, that he was acquainted with the testator, and showed such acquaintance with him as to make his opinion admissible as to whether or not from what he had observed, Mr. Hathaway was of sound mind. Then this question was asked him:

"Q.  Now Mr. Koch, during the latter part of his life you may state what, if anything, you observed of the conduct and speech of Charles Hathaway, Sr., indicating a lapse of memory."

The objection to this question was sustained.

There was no statement made as to what answer was expected, but on page 198, this question was asked of him. and he was permitted to answer it:

"Q.  You may state what you observed, your own observation of him, beginning with what you first observed and relate the incidents that occurred, as near as you can, down to the time that I have mentioned."

To this, he answered:

"A.  In 1887, at the time Mr. Hathaway was president of the St. Clair Street Railroad, there arose a controversy about the paving of St. Clair street, in which there was an investigation and Mr. Hathaway was called as a witness; at that time he stated that I was the owner of stock in the St. Clair Street road."

He then follows with a statement that he was not at that time the owner of stock in the St. Clair Street road, that Mr. Hathaway explained to him afterwards that a mistake was made, because he confused his ownership in the St. Clair Street road with his ownership in the Superior Street road, in which last named road, or rather in the street railroad operating on the last named street, he was an owner of stock.

From this it appears that all that could have been obtained from Koch by an answer to the question to which the objection was sustained was obtained in answering the latter question, and so no prejudice resulted to the plaintiffs.

While Frank DeHaas Robison was upon the stand on the part of the plaintiffs he was asked:

"Q.  What, if any change did you observe in Charles Hathaway, Sr., after the death of his son Charles and after his becoming insane, and after his death?"

The question is not very clear, but presumably it meant after Charles Hathaway, Jr., became insane, and after the death of Charles Hathaway, Jr.

This question was objected to by the defendants, and that objection was sustained, and it was stated on the part of the plaintiffs that if the answer was permitted, it was expected that the answer would be, that he became moody, would sit brooding by himself for some time and became fretful and morose.

Perhaps the answer should have been permitted. Indeed we think it should, but no error came to the plaintiffs by the ruling on this question, because of the action of the court in permitting an answer to a similar question, as appears on page 411 of the record. That question reads:

"Q. After Charlie lost his mind and was taken to Cuyahoga Falls, what was there in the conduct of Charles Hathaway, Sr., that drew your attention particularly to him, state as fully as you can. Describe and tell what you observed up to the time of the making of the will, September, 1896?"

The answer given, is as follows:

"A. He would come into the office to tell me something and in the middle of a sentence he would forget what he was talking about, and he would often ask me what he had said to me. He would repeat the same thing to me as often as four or five times during the morning."

Similar answers were made later on by Mr. Robison in answer to similar questions.

Besides the hypothetical question put to Mr. Sayle already discussed in this opinion, similar hypothetical questions were put to other non-expert witnesses, and upon objection of the defendants, answers were excluded.

What has been said in reference to the ruling of the question put to Mr. Sayle applies with equal force to the ruling on these questions, and nothing more need be said on that subject.

We find nothing, in our examination of this case, which would justify a reversal of the judgment of the court of common pleas, and such judgment is affirmed.